UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

RENEE EVERETT and
BUILDING WERKS OF WI, LLC

        Plaintiffs,

  v.                                             Case No. 10-C-634

PAUL DAVIS RESTORATION, INC., et al.,

        Defendants.

# ORDER GRANTING MOTION TO VACATE AND DENYING MOTION TO CONFIRM ARBITRATION AWARD

On June 26, 2010, Plaintiffs Renee Everett and Building Werks of WI, LLC, commenced this action for declaratory relief against Paul Davis Restoration, Inc. (PDRI), EA Green Bay, LLC (EAGB), and Matthew Everett (Rene's spouse) in state court. Plaintiffs sought a determination that they were not bound by the PDRI Franchise Agreement that Matthew Everett (Matt) had signed on behalf of himself and EAGB. The Agreement contained both an arbitration provision and a covenant not to compete. Alternatively, Plaintiffs sought a determination that the non-compete provision was unenforceable under Wisconsin law.

PDRI removed the case to federal court based on federal diversity jurisdiction, and shortly thereafter Plaintiffs filed a motion for a temporary restraining order and preliminary injunction to enjoin PDRI from maintaining or pursuing an arbitration proceeding it had commenced against Matt

and Renee Everett and EAGB, d/b/a Building Werks.[1] PDRI agreed not to proceed in the arbitration against Rene until the motion for a preliminary injunction was decided, but the arbitration went forward as to Matt Everett and EAGB, who were dismissed from this action. (ECF No. 133.) The arbitration against Matt Everett and EAGB continued to final hearing and on March 8, 2011, the Arbitration Committee entered a unanimous award in favor of PDRI and against Matt Everett and EAGB. (ECF No.113-1.) A state court recently confirmed that award, but a motion for reconsideration is pending. (ECF No. 174.)

Following a period of expedited discovery in this case, a hearing was held on the Plaintiffs' motion for a preliminary hearing on April 28, 2011. At the conclusion of the hearing, the Court found that Renee Everett had failed to demonstrate a likelihood of success on the merits and denied her motion for preliminary relief. (ECF No. 139.) The parties then stipulated to a stay of all further proceedings in this Court and proceeded to arbitration. (ECF No. 143.) Following a two day hearing, an arbitration panel issued its final Arbitration Decision (the Award) against Renee Everett and in favor of PDRI on February 14, 2012. (ECF No. 145-1.) The case is now before me on two related motions: PDRI's motion to confirm the award (ECF No. 145) and Plaintiffs' motion to vacate the award (ECF No. 149). For the reasons discussed herein, I now conclude that Renee Everett is not bound by the Franchise Agreement. Accordingly, PDRI's motion will be DENIED, and Plaintiffs' motion will be GRANTED.

---

[1] Building Werks of WI, LLC, had not yet been created at the time PDRI filed its claim for arbitration. As to jurisdiction, although Matt Everett and EAGB, like Plaintiffs Rene Everett and Building Werks of WI LLC, were citizens of Wisconsin at the time the action was filed, PDRI asserted that Matt Everett and EAGB were fraudulently joined as defendants. In denying Plaintiffs' motion to remand, the Court agreed that the Wisconsin defendants had been fraudulently joined and realigned the parties so that there was complete diversity. *See Wolf v. Kennelly*, 574 F.3d 406, 413 (7th Cir. 2009).

**BACKGROUND**

PDRI is the franchisor for a national network of more than 220 Paul Davis Restoration franchises who engage in "PDRI's business," defined as "insurance restoration construction, remodeling, loss mitigation, emergency services and cleaning of residential and commercial buildings and structures." (Supp. Decl. of Michael B Stokes, ECF No. 89, ¶ 4.) As franchiser, PDRI enters into franchise agreements with its franchisees (and their principal owners) and grants licenses permitting them to use PDRI's name, goodwill, systems, and methods of doing business. (*Id.* ¶¶ 5–7.) Effective September 1, 2004, Matt Everett and EAGB entered into a franchise agreement with PDRI, d/b/a Paul Davis of Northeast Wisconsin (NOWI), granting Matt Everett and EAGB the non-exclusive right to operate a Paul Davis Restoration franchise in the territory defined by the agreement.

Matt Everett was not new to the PDRI franchise system at the time he signed the NOWI franchise agreement, nor was NOWI his only PDRI franchise. In 1997, Matt Everett began working for one of PDRI's largest franchisees, Paul Davis Restoration of Southwestern Wisconsin (SEWI), and rose to Vice President of SEWI's Residential Division. (ECF No. 165, ¶ 6.) In 2002, Mr. Everett became a sub-licensee of the Paul Davis Restoration Fox Valley (FXWI) franchise and agreed to abide by the FXWI Franchise Agreement. (*Id.* ¶ 7.) He acquired the FXWI franchise and executed an addendum to the FXWI Franchise Agreement in 2007, and later that same year a third PDRI franchise, this one located in central Wisconsin and referred to as CTWI. His other two PDRI franchises have also been terminated, but only NOWI is the subject of this action.

Several sections of the NOWI Franchise Agreement are particularly relevant. First, Article 6.3 of the Franchise Agreement provides that "[a]ll shares of stock (or other ownership interest) of

3

Franchisee shall be held solely by Principal Owner and any transfer of such shares shall be subject to the provision of Article 20 of this Agreement." (ECF No. 89-2 § 6.3.) Article 20.1 provides in part: " Franchisee and Principal Owner shall not make any Transfer . . . without the prior written consent of PDRI . . ." (*Id.* § 20.1.) In order to obtain such consent, the franchisee was required to first submit to PDRl "a written request for PDRl's consent to Transfer, accompanied by a copy of the fully executed agreement for such Transfer (the 'Transfer Contract')." (*Id*. § 20.1(a).) The transferee was also required to "execute the then current franchise agreement (the standard franchise agreement used for a new franchise) and perform all the duties and obligations required to be performed, fulfilled and observed by the franchisee under such franchise agreement (excluding the payment of the initial franchise fee)." (*Id*. § 20.1(f)(iii).)

Next, the Agreement contains a non-compete provision, which provides that upon termination of the franchise, "Franchisee and Principal Owner shall not directly or indirectly engage in PDRI's business within . . . the Franchise Territory . . . . or in any geographic area in which PDRI or any franchise or affiliate of PDRI is now or is hereinafter engaging in PDRI's business . . . ." (*Id*., § 22.1.) The Agreement defines the phrase "directly or indirectly" engaging in PDRI's Business as including: "(i) acting as an agent, representative, consultant, officer, director, independent contractor or employee of any entity or enterprise; and ii) participating directly or indirectly in any such entity or enterprise as an owner, partner, limited partner, joint venturer, material creditor or stockholder (except as a stockholder holding less than a one percent (1 %) interest in a corporation whose shares are traded on a national securities exchange or in the over-the-counter market)."

The Agreement also contains a dispute resolution provision, which states that "[a]ny controversy or claim arising out of or relating to this Agreement or the acquisition or operation of

4

the franchise shall be settled by binding arbitration in accordance with the arbitration procedures as set forth in the Operations Manual." (*Id*. § 23.1.) Booklet Two of the Operations Manual provides that arbitration of disputes takes place before a panel or committee consisting of three PDRI franchisees and a Franchisor Advisor. Booklet Two provides that "the Franchisor Advisor serves as a nonvoting member of each Arbitration Committee during the committee deliberation, except where the Franchisor is a party to the arbitration," and the franchisor advisor "shall not be present during any voting by the Arbitration Committee." (ECF No. 89-1, § 2.13.2.)

Finally, an addendum to the Agreement states that it is to be governed by the Wisconsin Fair Dealership Law, Wis. Stat. §§ 135.01 et seq. (WFDL), "which makes it unlawful for a franchisor to terminate, cancel or fail to renew a franchise without good cause, as well as providing other protections and rights to the franchisee." (ECF No. 89-2 at 32.) The addendum further stated: "To the extent anything in the Franchise Agreement is contrary to the laws in the State of Wisconsin. said laws shall prevail." (*Id*.)

On August 17, 2004, Matt Everett executed the NOWI Franchise Agreement on behalf of EAGB as the "Franchisee" and individually as EAGB's 100% "Principal Owner." (ECF No. 89 ¶ 14; ECF No. 89-2 at 28.) Barely two months earlier, on June 11, 2004, however, Matt and Renee Everett signed a Members Agreement that listed each as owning 50% of EAGB. (ECF No. 90-3.) Annual reports filed with the State of Wisconsin from 2005 through 2009, as well as bank records from as early as January 2005, also list Renee as either a member, manager, or owner of EAGB. (ECF No. 90-2, 90-4.) Despite these records, the Everetts both testified in depositions that Renee first acquired a 50% interest in EAGB in the Fall of 2008. (ECF No. 90-1 at 62-63; 90-12 at 56.) In any event, it is undisputed that neither Matt nor Renee Everett ever submitted a written request

5

for a transfer of ownership to PDRI or obtained PDRI's written consent to such transfer as required under § 20.2 of the Franchise Agreement. And despite her ownership interest in EAGB, Renee Everett never signed the Franchise Agreement as owners and transferees were required to do.

Matt Everett contends that when the time came to renew the NOWI Franchise in 2009-10, PDRI attempted to force him to sign a new franchise agreement that substantially changed his franchise rights and responsibilities. He claims that PDRI refused to treat his franchises like other franchises in its system and placed him at a competitive disadvantage all in violation of the WFDL. Because he would not agree to the new terms PDRI offered, Matt contends that PDRI terminated the NOWI Franchise Agreement on March 1, 2010, for failure to pay overdue royalties. (March 13, 2012 Decl. of Matthew L. Everett, ECF No. 156, ¶ 3.) Matt claims he was paying the royalties into escrow while the parties were negotiating a renewal agreement and that he paid PDRI in full within days of the termination. Although PDRI accepted the overdue royalty payments, it nevertheless proceeded with the termination. Matt claims this is because PDRI had already promised his territory to a larger PDRI franchisee in southeastern Wisconsin. PDRI has since terminated Matt Everett's other PDRI franchises as well.

In any event, despite his claim that PDRI's decision to terminate the NOWI Franchise was in violation of the WFDL, Matt Everett did not file a claim against PDRI. Instead, he decided that he could sell his ownership interest in the business to Renee and let her run it as an independent business. (Matt Everett Decl., ECF No. 156, ¶ 4.) On March 10, 2010, Matt conveyed 45% of his ownership to Renee and the remaining 5% to Dan Egan, a former NOWI Franchise employee. (Aug. 20, 2010 Decl. Of Renee Everett, ECF No. 10, ¶ 5.) The Everetts thereafter proceeded to continue the operation of the business under the new name "Building Werks." (*Id.* ¶ 25.) A March

6

Case 1:10-cv-00634-WCG   Filed 09/18/12   Page 6 of 17   Document 185

24, 2010 announcement on the "Building Werks " website proclaimed: "After All These Years We Are . . . Changing our Name to Building Werks " and identified Matt Everett as a "related resource." (ECF No. 2-5 at 3.) On June 3, 2010, Renee Everett sent an email "blast" entitled "Same Great Service Under a New name!":

> We are proud to announce that we have the same great senior team and highly-trained staff formerly employed by Paul Davis Restoration of Northeast WI, collectively working with an owner who has dedicated years to building a strong and respected reputation in the Restoration and Remodeling Industry in Northeast Wisconsin. The name has changed, but the product remains the same and improves daily!

(ECF No. 91 at 16; ECF No. 2-6; ECF No. 90-6; ECF No. 90-1.)

On June 11, 2010, PDRI sent the Everetts a cease and desist letter. (ECF No. 2 ¶ 19.) On June 30, 2010, Ms. Everett formed the new legal entity Building Werks of WI, LLC. (ECF No. 91 at 16; ECF No. 90-1.) Despite the creation of a new LLC, however, the business continued to operate with the same employees in the same location using EAGB's bank accounts and its Federal Employer Identification Number until approximately October 2010. In the meantime, on July 1, 2010, PDRI submitted a claim against Renee Everett, Matt Everett, and EAGB, d/b/a Building Werks, pursuant to PDRI's Booklet Two arbitration rules, seeking to enforce the post-termination provisions in the Franchise Agreement. (ECF No. 2-1.) PDRI claimed the Everetts and EAGB breached the Franchise Agreement by engaging in a sham transaction in an attempt to avoid the post-termination non-competition and other covenants in the Franchise Agreement and by continuing to operate a competing business under the new name "Building Werks." (*Id.*)

The Arbitration Committee agreed with PDRI and issued an award against Ms. Everett in which it found that she was bound by the post-termination obligations in Article 22 of the NOWI

7

Franchise Agreement, by virtue of her secret undisclosed status as a "Principal Owner." (ECF No. 145-1 at 2.) The Committee further found that Ms. Everett had "aided abetted and conspired with Matthew Everett to operate the business known as Building Werks and to evade their obligations under Article 22 of the NOWI Franchise Agreement" and had thereby violated the non-compete provision. (*Id.*) Based upon its findings, the Committee enjoined Ms. Everett "for a period of two (2) years from the date of this decision from directly or indirectly engaging in the business of insurance restoration construction of residential and commercial building and the business of residential or commercial remodeling, loss mitigation or cleaning (PDRI's Business)" in the eight counties in northeast Wisconsin that comprised NOWI's territory, as well as "in any other geographic area in which PDRI or any franchisee or affiliate of PDRI is now or hereinafter may be engaging in PDRI's Business." (*Id.* at 3.) The Committee also enjoined Ms. Everett from transferring the Building Werks business as a going concern and from using any of PDRI's trade secrets. Ms. Everett was also ordered to provide an accounting of all business conducted by Building Werks and pay PDRI a 25% commission on all such business. Finally, the Committee ordered Ms. Everett to pay all costs and expenses of the arbitration and to pay PDRI's legal fees. (*Id.*)

Having prevailed in the arbitration, PDRI now seeks confirmation of the award pursuant to Section 9 of the Federal Arbitration Act, 9 U.S.C. § 9. Notwithstanding the fact that Renee Everett did not sign the Franchise Agreement, PDRI argues that she is nevertheless bound by it under the doctrine of equitable estoppel. Ms. Everett, on the other hand, opposes PDRI's motion to confirm the award and has filed a motion to vacate. In support of her motion to vacate, Ms. Everett contends that she is not bound by the Franchise Agreement, specifically the arbitration provision and the non-

8

compete provision, because she never signed the Agreement and PDRI has failed to establish that she directly benefitted from it. She further argues that even if she was bound by the Agreement, the award should still be vacated because the addendum to the Agreement making Wisconsin law controlling cancels the arbitration provision. Finally, Ms. Everett argues that the award cannot be confirmed because the arbitration provision is unconscionable, the arbitrators were biased, and the arbitrators exceeded and/or failed to properly exercise their powers.

## ANALYSIS

Arbitration is a creature of contract. Generally, a party cannot be compelled to arbitrate a dispute unless he has agreed to do so. *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) ("This Court has determined that 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" (quoting *Steelworkers v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960))). There are exceptions to the requirement that only signatories can be held to the terms of a contract, however, and those exceptions also apply to contracts containing arbitration provisions. The Seventh Circuit has recognized five doctrines through which a non-signatory can be bound by arbitration agreements entered into by others, including: (1) assumption; (2) agency; (3) estoppel; (4) veil piercing; and (5) incorporation by reference. *Zurich American Ins. Co. v. Watts Industries, Inc.*, 417 F.3d 682, 687 (7th Cir. 2005); *see also Arthur Anderson LLP v. Carlisle*, 556 U.S. 624, 631 (2009). However, "a court should be wary of imposing a contractual obligation to arbitrate on a non-contracting party." *Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 97 (2d Cir.1999).

9

PDRI argues that Ms. Everett is bound by the Franchise Agreement, even though she did not sign it, under the direct benefit estoppel doctrine. Under this doctrine, "[a] nonsignatory party is estopped from avoiding arbitration if it knowingly seeks the benefits of the contract containing the arbitration clause." *Zurich*, 417 F.3d at 688 (citing *Thomson–CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 779 (2d Cir.1995)). But "the benefit must be direct – which is to say, flowing directly from the agreement." *MAG Portfolio Consultant, GMBH v. Merlin Biomed Group LLC*, 268 F.3d 58, 61 (2d Cir. 2001). Moreover, "[t]he use of equitable estoppel is within a district court's discretion." *Grigson v. Creative Artists Agency L.L.C.*, 210 F.3d 524, 528 (5th Cir. 2000).

In arguing that the direct benefit doctrine applies to bind Ms. Everett to the Franchise Agreement, PDRI cites the Court's ruling denying her motion for a preliminary injunction. Following a hearing on the motion, I found that there was abundant evidence Ms. Everett had received a direct benefit from the Franchise Agreement. I noted that this was a family-owned business from which the Everetts had profited and then suggested that, acting in equity, it was appropriate to look behind the legal fiction of a limited liability company and focus on the underlying facts of the case. Those facts, the evidence showed, were that Matt Everett had colluded with his wife to avoid the legal obligations of the Franchise Agreement he and EAGB had signed by transferring his remaining interest in EAGB to Ms. Everett, who was then to continue the operation of the business under the name Building Werks. (April 28, 2011 Hearing Transcript 154:7-157:18.) I am no longer convinced that this was a correct application of the direct benefit estoppel doctrine.

This is not to say that Matt Everett did not breach the Franchise Agreement by transferring a 50% interest in EAGB to Renee without first obtaining PDRI's written consent. Indeed, if, as the

10

evidence suggests, Renee was already a half-owner of EAGB at the time he signed the Franchise Agreement in August of 2004, Matt may have committed fraud by concealing this fact and signing the Agreement himself as the sole owner of EAGB. On the other hand, the Everetts contend that even though they did not comply with the provisions of the Franchise Agreement governing transfers of ownership interests in the franchisee, they did not conceal from PDRI the fact that Renee was an owner. In fact, even PDRI acknowledges that Renee repeatedly held herself out as an owner of the NOWI Franchise at annual PDRI Franchise conventions and was named as an owner, along with Matt, in a 2005 arbitration claim against PDRI. (Supp. Decl. of Michael B. Stokes, ECF No. 89, ¶¶ 19-22.) But even absent fraud, to the extent Matt and EAGB breached the Franchise Agreement by failing to disclose the transfer, PDRI was entitled to recover from them any damages it sustained as a result of his breach. The record indicates that PDRI did just that in a separate arbitration. The question of whether Renee is also bound by the Agreement, however, is separate and distinct from Matt's actions. To hold her to the Agreement, PDRI must demonstrate that she knowingly and directly benefitted from the Agreement.

PDRI contends that it is undisputed that Ms. Everett "received direct economic benefits that would not have existed but for the Franchise Agreement." (PDRI Combined Response To Pl.'s Mot. To Vacate Arb. Award and Reply In Support of Mot. To Confirm (PDRI Resp.), ECF No. 164, at 11.) (underline original). "In fact," PDRI argues, "Ms. Everett's competing business 'Building Werks' would not exist but for the Franchise Agreement; she secretly owned and operated the franchise business for years and now continues to trade upon the name, reputation, and goodwill of the business – all of which derived from the Franchise Agreement." (*Id*., at 11-12.)

11

All this may be true. But in order to hold Ms. Everett to a contract she did not sign, PDRI must show that she benefitted directly from the contract, not the business that the contract made profitable. The Second Circuit explained the difference in *MAG Portfolio Consultant* in its discussion of two earlier cases it had decided. The Court cited *Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.*, as an example of a nonsignatory who was bound by an arbitration clause because it had directly benefitted from the agreement containing it. 9 F.3d 1060 (2d Cir.1993). That case involved an agreement which governed the terms of use of a trade name. A nonsignatory who had received a copy of the agreement, raised no objections to it, and made use of that trade name pursuant to the agreement, was held estopped from arguing it was not bound by the arbitration clause in the agreement. *Deloitte*, 9 F.3d at 1064.

In contrast, the *MAG Portfolio* Court noted that "the benefit derived from an agreement is indirect where the nonsignatory exploits the contractual relation of parties to an agreement, but does not exploit (and thereby assume) the agreement itself." To illustrate this situation, the Court described its holding in *Thomson-CSF v. Am. Arbitration Ass'n*, 64 F.3d 773 (2d Cir. 1995):

> In *Thomson-CSF*, for example, two companies agreed to trade exclusively with each other. *Id.* at 775. A third-party competitor acquired one of the companies, apparently with the intent of squeezing the remaining company out of the market. *Id.* The unacquired signatory was contractually bound to trade only with a company that was now a subsidiary to its competitor. *Id.* Thus, interest in trading waned. *Id.* While the agreement was crucial to the benefit the third party gained by shutting its competitor out of the market, the agreement was not the direct source of the benefit. *Id.* at 778-79. Rather, the benefit flowed from the nonsignatory's exploitation of the contractual relation created through the agreement by acquiring one of the signatories to the agreement.

268 F.3d 61-62.

12

This case is more like *Thomson-CSF*. Here, Ms. Everett exploited, or benefitted from, the contractual relationship her husband and EAGB had with PDRI. EAGB presumably was profitable because of the PDRI franchise. As Matt's spouse and co-owner of EAGB, Ms. Everett had a right to share in the profits. But this benefit was indirect; it derived from her ownership interest in EAGB and/or her marriage, not directly from the Franchise Agreement. This is not the kind of benefit that would bind her to the Franchise Agreement. Otherwise, PDRI would have no reason to have the owner of the legal entity operating the franchise separately sign the Franchise Agreement in his individual capacity. Why have the owner sign separately if he is already contractually bound by virtue of the benefit he derives from the agreement as an owner. Indeed, if that were the rule, all business owners would be liable on the contracts of their corporate entities. This would essentially eliminate one of the chief advantages of adopting a corporate or LLC form of doing business. Absent evidence that the nonsignatory directly benefitted from the agreement, "a signatory may not estop a nonsignatory from avoiding arbitration regardless of how closely affiliated that nonsignatory is with another signing party." *MAG Portfolio Consultant*, 268 F.3d at 62.

The result would be different if Ms. Everett was herself seeking relief from PDRI under the Franchise Agreement. If, for example, she had brought suit personally for wrongful termination of the Franchise Agreement, PDRI would be entitled to submit the matter to arbitration, and Ms. Everett would be estopped from refusing to arbitrate on the ground that she had not signed the Agreement. This is what courts mean when they say that such a party "cannot have it both ways." *See Hughes Masonry Co., Inc. v. Greater Clark County School Bldg. Corp.*, 659 F.2d 836, 839 (7th Cir. 1981). In *Hughes Masonry*, for example, a masonry contractor brought suit against the construction manager on a project governed by a contract with a county school building corporation

13

containing an arbitration clause. The construction manager moved to compel arbitration, but the masonry contractor refused on the ground that the construction manager was not a party to the contract with the school building corporation. The court held that the masonry contractor was equitably estopped from refusing to arbitrate because its complaint was fundamentally grounded on manager's alleged breach of obligations assigned to it in agreement between masonry contractor and county school building corporation:

> [W]e believe it would be manifestly inequitable to permit Hughes to both claim that J.A. is liable to Hughes for its failure to perform the contractual duties described in the Hughes-Clark agreement and at the same time deny that J.A. is a party to that agreement in order to avoid arbitration of claims clearly within the ambit of the arbitration clause. "In short, (plaintiff) cannot have it both ways. (It) cannot rely on the contract when it works to its advantage, and repudiate it when it works to (its) disadvantage."

*Id.* at 838-39 (quoting *Tepper Realty Co. v. Mosaic Tile Co.*, 259 F. Supp. 688, 692 (S.D.N.Y.1966)). That is not what has occurred here. Ms. Everett is not seeking to hold PDRI to obligations it would have, if at all, only under the Franchise Agreement. In fact, Ms. Everett hasn't asserted any claim against PDRI. The cases cited by the parties suggest that this is key.

In *American Bureau of Shipping v. Tencara Shipyard S.P.A.*, for example, a case PDRI refers to as seminal, a group of nonsignatory yacht owners and their subrogated insurers brought multiple lawsuits against American Bureau of Shipping, a classification society that inspected the construction of the yacht and certified it as seaworthy under the relevant international safety conventions and rules. 170 F.3d 349 (2nd Cir. 1999). The owners and their insurers claimed that the Bureau was liable for repairs after it turned out that the hull was defectively designed and constructed. They opposed the Bureau's action to compel arbitration on the ground that they were not signatories to the arbitration agreement the Bureau had entered with shipbuilder. The Court held

14

that the owners and their insurers were estopped from denying the contract because they had received direct benefits from it, including (1) significantly lower insurance rates on the yacht, and (2) the ability to sail under the French flag. *Id.* at 353. And as in *Hughes Masonry*, it was the contract containing the arbitration clause that gave rise to the duty the owners claimed the Bureau had breached in their actions against the Bureau.

The same is true of *Blaustein v. Huete*, an unpublished decision from the Fifth Circuit upon which PDRI also relies. 449 Fed. Appx. 347 (5th Cir. 2011). In *Blaustein*, an individual member of a limited liability company, Huete, sued the law firm with which the LLC had contracted for legal services in connection with a patent application. The defendant law firm moved to dismiss on the ground that the fee agreement called for arbitration of disputes between the parties. Although Huete had not signed the agreement in his individual capacity, the district court concluded that Huete was bound by the agreement under the direct benefits estoppel doctrine. The Fifth Circuit affirmed, holding that the district court had not abused its discretion. In so ruling, the Court noted that Huete had "obtained the same sort of benefits from the fee agreement that a client would have received." *Id.* at 350. The Court also observed that "Huete's claims, whether they all enforce the fee agreement or not, must be determined, at least in part, by reference to that agreement." *Id.; see also Bridas S.A.P.I.C. v. Government of Turkmenistan*, 345 F.3d 347, 362 (5th Cir. 2003) (In cases where courts seriously consider applying direct benefits estoppel, "the nonsignatory had brought suit against a signatory premised in part upon the agreement".); *International Paper Co. v. Schwabedissen Maschinen & Anlagen*, 206 F.3d 411, 418 (4th Cir. 2000) ("In the arbitration context, the doctrine recognizes that a party may be estopped from asserting that the lack of his signature on a written contract precludes enforcement of the contract's arbitration clause when he has consistently

15

maintained that other provisions of the same contract should be enforced to benefit him."); *Johnson v. Polaris Sales, Inc.*, 257 F. Supp. 2d 300, 307–308 (D. Me. 2003) ("not only have Gregory and Kim Johnson enjoyed the direct contractual benefit of purchasing Polaris products during the life of the Dealer Agreement, they have also based their present action in part upon those benefits.").

Here, by contrast, Ms. Everett has not asserted any claim against PDRI based upon or related to the Franchise Agreement. It is true, as noted above, that Ms. Everett was listed as an owner of NOWI, along with Matt and EAGB, in an unrelated Arbitration Complaint against PDRI for breach of the Franchise Agreement in March of 2005. (Aff. of Edmund J. Jelinski, ECF No. 106, at 3.) But the attorney who drafted the Arbitration Complaint in that matter acknowledged that the inclusion of Ms. Everett as an owner of the franchise was a mistake on his part that was immaterial to the outcome of the case since she was simply joined as a party on claims that were properly asserted by Matt and EAGB. (*Id.* ¶¶ 3-5.) Moreover, in its response to the Complaint, PDRI acknowledged only that Matt was the principal owner of the franchise operated by EAGB, not Renee. (*Id.* ¶¶ 6, 7.) Since the claim was in any event unsuccessful (Aff. of David H. Weber, Ex. 2), it does not serve as evidence that Renee Everett directly benefitted from the Franchise Agreement.

## CONCLUSION

Based on the foregoing, I now conclude that Ms. Everett did not directly benefit from the Franchise Agreement and thus cannot be bound by it under the doctrine of direct benefits estoppel. Since PDRI has offered no other theory on which she might be held bound by the Agreement, I conclude that the arbitration award cannot be confirmed. Accordingly, PDRI's motion to confirm

16

the award (ECF No. 145) is denied, and Plaintiffs' motion to vacate the award (ECF No. 149) is granted.[2] The Clerk shall place this matter on the Court's calendar for a telephone status conference to discuss what if any further proceedings are required to bring this matter to conclusion.

**SO ORDERED**  this   18th   day of September, 2012.

                                           s/ William C. Griesbach
                                          William C. Griesbach
                                          United States District Judge

---

[2] Plaintiffs had also argued that PDRI's brief in response to Plaintiffs' motion to vacate the award should be struck for exceeding the page limit allowed for a response under Civil L.R. 7(f). (ECF No. 172 at 1.) But pursuant to the local rules, PDRI was entitled to file (1) a 30-page response to Plaintiffs' motion to vacate and (2) a separate 15-page reply in support of PDRI's motion to confirm. PDRI combined the two briefs into a single 45-page brief. Ms. Everett's motion to strike accordingly fails and the Court accepts PDRI's single 45-page brief. Plaintiffs have also moved to supplement the record with a declaration from a former franchisee who initially served on the Arbitration Committee in Matt Everett's case. (ECF No. 175.) The affidavit is offered as support for Plaintiffs' argument that the PDRI arbitration procedure is inherently biased against franchisees who have been terminated. Although PDRI opposes Plaintiffs' motion and the Court has decided the case on other grounds, the motion will be granted. PDRI's opposition is addressed more to what, if any, weight the affidavit should be accorded. Plaintiff is entitled to present by affidavit the factual basis for his argument.

17